UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MICHAEL J. J.,[1]

    Plaintiff,

  v.

KILOLO KIJAKAZI, Acting Commissioner of Social Security,

    Defendant.

Case No. 20-cv-722-JPG

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his applications for Disability Insurance Benefits (DIB) and a period of disability pursuant to 42 U.S.C. §§ 416(i) and 423 and Supplemental Security Income (SSI) pursuant to 42 U.S.C. §§ 1381a and 1382(a).

## Procedural History

Plaintiff applied for DIB and SSI in August 2017 alleging disability beginning November 14, 2015. After holding an evidentiary hearing in April 2019, ALJ Michael D. Shilling denied the application in a written decision dated June 19, 2019. (Tr. 12-40.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1-6.) Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

- the ALJ erred in evaluating Plaintiff's subjective symptoms;

- the ALJ failed to include all of Plaintiff's mental limitations in the Residual Functional Capacity (RFC) assessment and in the hypotheticals to the Vocational Expert (VE); and

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order to protect the plaintiff's privacy. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

- the ALJ erred in not inquiring further into an alleged conflict between the VE's testimony and the conditions of the jobs identified.

## **Applicable Legal Standards**

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[2] The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but that the impairment is neither listed in nor equivalent to the impairments in the regulations—

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423 *et seq.* and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c *et seq.* and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are materially the same. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020). Furthermore, 20 C.F.R. § 416.925, which details medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The Decision of the ALJ

ALJ Shilling followed the five-step analytical framework described above. He determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date and that he was insured for disability benefits through December 31, 2019. The ALJ found that plaintiff had severe mental and physical impairments of:

>disorder of the back, coronary artery disease (CAD) status post stent, degenerative joint disease of the knee, osteoarthritis of the carpometacarpal (CMC) joint, ulnar nerve entrapment, degenerative and osteoarthritic hip changes, degenerative right shoulder changes, depressive disorder, bipolar disorder, narcissistic personality disorder, borderline personality disorder and anxiety disorder.

(Tr. 17.) He further found these impairments significantly limited Plaintiff's ability to perform basic work activities. The ALJ rejected the notion that Plaintiff's hypertension, thyroid disorder, hyperlipidemia, irritable bowel syndrome, gastroesophageal reflux disease (GERD) and kidney disease were severe impairments that significantly limited Plaintiff's ability to perform basic work activities. (Tr. 18.) Nor did he find that any impairment or combination of impairments met or equaled a listed impairment. He specifically considered Listings 1.04, 1.02, 4.02, 12.04, 12.06, and 12.08, although he found Plaintiff was moderately limited in interacting with others, in concentrating, persisting, or maintaining pace, and in adapting or managing himself. (Tr. 19-20.)

The ALJ found that Plaintiff had the RFC to perform work at the light exertional level (lifting twenty pounds at a time and ten pounds frequently; standing or walking six hours in an eight-hour workday) as long as there was only occasional climbing, stooping, crouching, kneeling or crawling; no prolonged exposure to vibrating machinery; no unprotected heights or hazardous moving machinery; and simple, routine and repetitive tasks with only occasional interaction with coworkers or the general public. The ALJ found Plaintiff had the ability to accept supervision on a basic level. (Tr. 20.)

Based on the VE's testimony, the ALJ found that Plaintiff could not do his past relevant work (billing manager, regional manager, restaurant server, and office manager) but that he was not disabled because he was able to do other unskilled jobs at the light exertional level which exist in significant numbers in the local and national economies given his age, education, work experience, and RFC (merchandise marker, routing clerk, and folding-machine operator). The

ALJ concluded that Plaintiff was not disabled.  (Tr. 33-34.)

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by Plaintiff and is confined to the relevant time period.

### 1.     Agency Forms

Plaintiff was born in March 1967 and was 48 years old at his alleged onset date of November 14, 2015.  He was last insured for DIB on December 31, 2019.  (Tr. 129.)  He had worked as a billing manager, regional manager, server, and office manager.  He had obtained his high school diploma and had some college.  (Tr. 142-43, 158-59).

### 2.     Evidentiary Hearing

ALJ Shilling held an evidentiary hearing on April 10, 2019.  At the hearing, Plaintiff was represented by an attorney.  (Tr. 67-100.)

Plaintiff testified that he lived with his wife and two children.  He had a driver's license and was still able to drive but only did so a couple of times a month because of the effects of his medication.  (Tr. 71-72.)  Plaintiff went grocery shopping, but with someone else who could bag the groceries and load them into the car.  He was able to walk around the store but immediately lay down when he got home and could not help with putting the groceries away.  He was unable to lift the groceries because of his back pain.  (Tr. 79-81.)  He was able to sweep a room, but his family handled the other chores.  (Tr. 92.)  He testified that he would have been able to wait tables if he had not had degenerative disc disease and arthritis in his hands and knees.  With those conditions, though, he was unable to stand or sit for very long, which prevented him from cooking or traveling.  (Tr. 72.)

Plaintiff testified that he had daily pain in his middle and lower back that he treated with rubs. Walking and standing made the pain worse and sometimes left him confined to bed for a day or two. He testified that he could walk for a block without difficulty and that standing for more than 15 minutes caused him pain. (Tr. 74-75.) He was able to walk around town with friends for a couple of hours but was really hurting the following day and would have been unable to wait tables in that condition. He was able to lie down flat on his back without pain and did so for at least an hour three or four days a week. He also spent time in the kitchen and at the computer, but not for long because sitting hurt. (Tr. 76.)

He also testified that he had neck pain that rendered him unable to turn his head to the right. He also had cramps in his legs that would wake him up at night. (Tr. 77.) He had been taking medication to help him sleep, but it caused him to fall and injure his knee, which required him to wear a brace, which, in turn, was unwieldy and caused him to fall again. He only wore the brace when he went out for any kind of distance, and the sleep medication was eventually discontinued. He was unable to run or do cardiac rehabilitation because of his knee pain. His wife had to help him put on his socks and sometimes his jeans. Plaintiff testified he had done physical therapy for years and had been compliant. (Tr. 78-79.) He had difficulty climbing the stair to the front porch and fell there twice. (Tr. 93.)

He also testified that had arthritis in his thumbs that prevented him from grasping things and made it hard for him to type. He testified that he had a history of swelling in his right arm and pain when he bent it; he had a pinched nerve in his left arm that limited him to lifting five pounds; and a history of torn rotator cuff in his right shoulder that caused him pain when he lifted his arm. (Tr. 81-83.)

Plaintiff testified that his cardiac problems were relatively under control since he had had

stents put in the year before the hearing. (Tr. 84.) He testified that his blood pressure medicine made him dizzy, so his wife stayed in the bathroom when he took baths and showers. (Tr. 78-79, 84, 93.) His medication also made him tired, have to urinate frequently, and slow to wake in the morning. (Tr. 85.)

He testified that his mental impairments made him unable to deal with any kind of stress outside of a completely controlled environment. He took at least twenty pills a day, and he was unable to function, concentrate, or handle his emotions. (Tr. 72-73.) He testified that he had mood swings, sometimes both ways within the same day, and had a manic episode that prevented him from sleeping. (Tr. 86.) Manic episodes caused him to talk fast, make bad decisions, and get mad easily, so he sometimes isolated in his room during those periods. (Tr. 88.) He also could not sleep during the day and woke up in the middle of the night without getting a full night of uninterrupted sleep. (Tr. 94-95.) On a weekly basis, there were days his depression was so bad he was unable to get out of bed and get dressed for days at a time. (Tr. 87.) He was able to get along with peers and subordinates, but not supervisors, when he could become enraged when told he was wrong. This caused him to walk away from a couple of jobs. (Tr. 88-89.)

Plaintiff testified that he blogged on Twitter but that he had lost interest in sports. He liked spending time with his wife and kids and tried to be a good husband and father. He was sometimes able to participate in his children's activities but had a panic attack once while doing so. He had had one or two panic attacks. (Tr. 87-88.) Plaintiff testified he had a hard time concentrating. He watched a little television, but not every night; could not go to the movies because he could not sit for two hours; and had lost interest in reading and other activities he once was excited about like fantasy sports. (Tr. 89-90.) He did not socialize with anyone but his family. (Tr. 93.)

His memory problems caused him to lose track of conversations and forget to refill

prescriptions or which pills he was supposed to be taking when his medications changed.  (Tr. 91-92.)

### 3. Medical Records

The record contains progress notes from Plaintiffs' mental health treatment at Wyandot Center from November 2015 to February 2017 (Tr. 421-507); the University of Kansas Hospital from October 2016 to October 2017 (Tr. 918-79); and Johnson County Mental Health from September to December 2017 (Tr. 511-37, 986-1008).  None of Plaintiff's mental health providers provided any assessment of his mental RFC.

The record also includes records from the University of Kansas Hospital from December 2015 to February 2019 reflecting over a hundred visits for various health problems including hip pain, lower back pain, neck pain, hypertension, chest pain, abdominal pain, thyroid problems, sleep problems, flank pain, rash, congestion, foot pain, colonoscopy, hand numbness/tingling, constipation, diarrhea, foot fracture, epigastric pain, depression, anxiety, self-harm, nausea, vomiting, mouth sores, chronic kidney disease, throat problems, groin pain/numbness, prostate problems, pelvic pain, arm pain, shoulder pain, leg pain, knee pain, neck swelling, cardiac problems, cough, hyperlipidemia, bruising, penis swelling, and testicular pain.  (Tr. 538-911, 1011-1661.)  He also participated in physical therapy and cardiac rehabilitation at various times (Tr. 1662-1721).

The record further reflects the following diagnostic imaging with respect to Plaintiff's <u>back and hip</u>:

- 2015 hip MRI and x-rays showing mild arthritic changes and possible small labral tear (Tr. 613, 617.);
- June 14, 2017, cervical spine x-rays showing no acute or subacute changes of the cervical spine and no fractures or bone lesions; normal alignment of the cervical spine; preservation of disc spaces; normal predental space; and unremarkable facet joints (Tr. 774.);

- A June 22, 2017, lumbar spine MRI showing mild degenerative disc disease minimally progressed; slight increase of small right paracentral protrusion at L1-2; unchanged right central and paracentral protrusion at L3-4; increase of epidural lipomatosis within the lower lumbar spine which, combined with mild facet and ligamentous changes, results in moderate central stenosis at L5-S1 (Tr. 509-10, 801, 1359-60.);

- A January 4, 2018, cervical spine MRI showing minimal multilevel degenerative changes in the cervical spine, worst at C4-5 (Tr. 1167, 1358-59.); and

- January 31, 2018, thoracic spine x-rays showing thoracic vertebrae with normal height and alignment and no compression; tiny punctate metallic density overlying the posterior aspect of the T7 vertebrae; unremarkable endplates and pedicules; minimal degenerative change of the midthoracic spine with minimal spurring (Tr. 1258.).

The record contained the following diagnostic imaging regarding Plaintiff's <u>knees</u>:

- November 2, 2018, unremarkable left knee x-rays (Tr. 1605, 1616.); and

- December 11, 2018, knee x-rays showing a normal left knee with normal alignment, joint spaces maintained, no fractures or lesions, and no joint effusion, and a normal right knee (Tr. 1621.).

The record contained the following objective tests of Plaintiff's <u>upper extremities</u>:

- a July 18, 2017, normal, benign electromyography (EMG) with no evidence of entrapment neuropathy, cervical radiculopathy or any other abnormal neuromuscular process (Tr. 906.);

- A March 15, 2018, MRI of the humerus with normal results (Tr. 1278.);

- June 1, 2018, hand x-rays showing moderate to marked right and marked left osteoarthritis in the first CMC (a joint at the base of the thumb) but no acute osseous abnormality of the hands or evidence of erosions (Tr. 1364.); and

- A January 3, 2019, EMG showing evidence of a left ulnar entrapment neuropathy at the elbow but no evidence of other nerve entrapment, cervical radiculopathy, plexopathy, or other abnormal neuromuscular process involving either upper extremity (Tr. 1630.).

The record contained the following objective tests of Plaintiff's <u>shoulders</u>:

- A March 15, 2018, right shoulder MRI showing two incidental tiny tears and mild distal infraspinatus tendinosis (Tr. 1278, 1551.); and

- Observations of normal range of motion (Tr. 1312, 1551.).

None of Plaintiff's physicians provided any assessment of his physical RFC. Additionally, the records of his more than 100 medical visits are replete with statements that Plaintiff was doing well or improving and that his conditions were responding to treatment or were manageable (*see, e.g.,* Tr. 613, 629, 637, 651, 705-06, 1311, 1353.), and that objective tests showed benign, negative, unremarkable or mild results (*see supra*.). Records also show that Plaintiff's gait and range of motion in his spine were normal (Tr. 463, 477, 616, 771, 800, 1616.), and that his range of motion in his neck was normal and/or he had no neck pain (Tr. 800, 1548, 1550, 1644-45.) It was also noted several times that Plaintiff was seeking only a part-time job so as not to exceed the income threshold to receive benefits.

### 4. State Agency Physicians/Consultants

State agency consulting physician Paul Spence, M.D. evaluated Plaintiff in November 2017. He opined that Plaintiff was capable of light work (occasionally lifting 20 pounds and frequently lifting 10 pounds); sitting, standing, or walking for 6 hours in an 8-hour workday; limited to (1) no more than frequently climbing ramps, stairs, ladders, ropes, or scaffolds; (2) no more than frequently balancing, stooping, kneeling, crouching, or crawling; (3) no concentrated exposure to vibration; and (4) no concentrated exposure to hazards such as machinery or heights. (Tr. 136-40, 152-56.)

On reconsideration in March 2018, state agency consulting physician David Braverman, M.D. reviewed updated records and concurred with Dr. Spencer's conclusions with one exception—the task of balancing—which he believed should not be restricted at all. (Tr. 174-77, 194-96.)

State agency psychologist Martin Isenberg, Ph.D. reported in November 2017 that despite moderate limitations in interacting with others and concentration, persistence, or pace, Plaintiff

10

could still (1) perform and persist at simple tasks; (2) adequately interact with others if he had limited contact with the general public; and (3) work in a noncomplex work environment. (Tr. 133-35, 141-42, 149-51, 156-58). On reconsideration in March 2018, state agency psychologist Richard Kasper, Ph.D. essentially agreed with Dr. Eisenberg, concluding that Plaintiff could complete simple, repetitive tasks on a routine basis with limited contact with the public and that he could likely increase his abilities through medical management of his conditions. (Tr. 172, 179, 191.)

## Analysis

### 1. Evaluation of Plaintiff's Subjective Symptoms

When evaluating subjective symptoms in a disability claim, the ALJ should first determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce those symptoms. The ALJ should then consider all the relevant evidence in the record to determine how the intensity and persistence of the symptoms limit the claimant's ability to perform work-related activities. 20 C.F.R. § 404.1529(a); *see* Soc. Sec. Ruling (SSR) 16-3p, Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *3-*4 (S.S.A. Oct. 25, 2017); *Wilder v. Kijakazi*, 22 F.4th 644, 653-54 (7th Cir. 2022). In evaluating the intensity, persistence, and limiting effects of symptoms, the ALJ must consider the objective medical evidence, the claimant's statements of the symptoms' intensity, persistence and limiting effects, medical source statements, non-medical source statements, as well as the other relevant factors set forth in 20 C.F.R. 404.1529(c)(3). SSR 16-3p, 2017 WL 5180304, at *5-*8. Those specific factors include "the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). The ALJ must give "specific reasons for the weight given to the individual's symptoms, be consistent with and

supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

ALJ Shilling found Plaintiff suffered from medically determinable impairments that could reasonably be expected to produce the symptoms about which Plaintiff complained. However, he found that Plaintiff's statements concerning the intensity, persistence, and limiting effect of those symptoms, including pain, were not entirely consistent with the medical records and other evidence in the record. (Tr. 27.) He used language that has been disapproved by the Court of Appeals as "meaningless boilerplate" unless further supported by an explanation for discounting or rejecting Plaintiff's testimony. *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013). However, ALJ Shilling adequately explained the decision to give Plaintiff's statements less weight. Specifically, the ALJ found the statements disproportionate to the objective findings, although those findings supported some limitations.

He noted Plaintiff's claims of back pain and limitations on standing, walking, turning his head, and ability to get out of bed are not supported by diagnostic imaging, which showed only mild or limited moderate findings and no extreme, severe, or advanced findings. He further pointed to numerous medical observations of normal range of motion in Plaintiff's lumbar spine, hips, and neck, and a normal gait, which would not be expected with the level of pain Plaintiff alleged. (Tr. 27-28.) ALJ Shilling also considered Plaintiff's own statements of improvement in his pain with treatment, which he found inconsistent with Plaintiff's representation that his pain kept him from working. (Tr. 28.) ALJ Shilling also found Plaintiff's statements of his limitations inconsistent with his self-described activities that included fishing, swimming, going to the lake with his family, and walking around town, and found no indication in the medical records that

12

these activities caused trouble.³  (Tr. 28.)

ALJ Shilling also found that Plaintiff's claim of knee pain was inconsistent with diagnostic imaging showing only mind findings, physical examinations showing a normal gait and only mild pain, and improvement after a nerve block.  He further found questionable Plaintiff's representations that knee pain was preventing him from doing cardiac rehabilitation for four months after placement of stents, even after a successful nerve block procedure.  The ALJ further found Plaintiff's description of his limitation of walking only a block inconsistent with the fact that he was able to walk around town without any indication in the medical records that it caused him trouble.  (Tr. 28.)

As for the limitations from Plaintiff's hand and arm impairments, ALJ Shilling noted no medical records of some alleged incidences and other objective tests indicating mostly benign results.  To the extent there was evidence of upper extremity impairments from osteoarthritis, the ALJ noted that Plaintiff had responded to treatment, contrary to his statements of severity.  Additionally, the ALJ found the level of impairment Plaintiff alleged was inconsistent with his activities, which included playing basketball and video games, writing a book, writing a blog, and driving, even though he could only do these activities for a limited time.  (Tr. 28-29.)

The ALJ doubted Plaintiff's attribution of falls to his medication where evidence in the record shows his falls were after tripping or stumbling over things.  (Tr. 29.)

The ALJ found Plaintiff's description of his shoulder problems inconsistent with medical observations of normal range of motion and diagnostic imaging showing minimal findings.  He also noted improvement with treatment.  (Tr. 29.)

The ALJ found Plaintiff's testimony about the severity and limiting effects of his mental

---

³ The ALJ misquoted the record by saying Plaintiff could do short "sprints" when it actually he exerted himself in short "spirts."  (Tr. 1538.)  This error is harmless in that it is immaterial to the ALJ's ultimate decision.

impairments and psychiatric symptoms inconsistent with parts of his own testimony about his activities and abilities, and evidence that his symptoms improved with medication and use of coping skills. The ALJ specifically considered mental exam notes showing various mental abilities despite his impairments and Plaintiff's ability to function in volunteer activities. (Tr. 29-30.)

Finally, the ALJ considered the agency consulting physician opinions and psychologist opinions which opined that Plaintiff was able to perform light work with certain restrictions. He found these opinions mostly consistent with the rest of the record, but imposed even more restrictions in Plaintiff's RFC based on the hearing testimony. (Tr. 30-32.) Notably, there is no contrary opinion from any physician or psychologist elsewhere in the record. *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error.") (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)).

Additionally, Plaintiff's counsel did not seek to add a later medical or psychological opinion even though she now claims the ones in the record—both reconsidered in 2018 about a year before the ALJ's hearing—were stale because they did not consider Plaintiff's 2018 cardiac problems or other treatments. The ALJ considered Plaintiff's cardiac problems that occurred after the consulting physicians' opinions but noted that, as Plaintiff testified, they were relatively under control since the stent placement in 2018. (Tr. 31, 84.) And the other later records were generally consistent with earlier records showing non-severe results. It was appropriate for the ALJ to find it unlikely that a problem that was under control or tests that were generally consistent with earlier tests would have had a reasonable chance of changing the reviewing physicians' opinions that were only about a year old. *See Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir.), *as amended on reh'g* (Apr. 13, 2018) ("An ALJ should not rely on an outdated assessment if later evidence containing

14

new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion."); *accord Pavlicek v. Saul*, 994 F.3d 777, 783-84 (7th Cir. 2021). Nevertheless, in light of Plaintiff's testimony that his cardiac symptoms were aggravated by stress, the ALJ incorporated into his RFC limitations to simple, routine, and repetitive tasks and limited interactions with others to minimize Plaintiff's known stressors.

In sum, the ALJ found, based on all the available sources listed in 20 C.F.R. § 404.1529(a), that Plaintiff's suffered symptoms from his multiple severe impairments but that the symptoms were not as severe as Plaintiff alleged and did not cause the level of impairment Plaintiff asserted. He did not disregard Plaintiff's subjective complaints of pain or other symptom but simply found them less convincing in light of the record as a whole, yet still imposed RFC limitations to account for factors aggravating the symptoms. As noted above and as repeatedly explained in his clearly articulated decision with pin-point citations to evidence in the record, the ALJ gave specific reasons for weighing the evidence as he did. That he used boilerplate language as a preface to this detailed analysis does not detract from that analysis. Because the ALJ's symptom evaluation is supported by substantial evidence and is not "patently wrong," the Court accepts it as adequate.

### 2. Mental RFC Assessment and Hypotheticals to the VE

The Plaintiffs' mental RFC included the finding that he was moderately limited in concentration, persistence, and pace. (Tr. 19.) The ALJ found that Plaintiff's concentration was not as impaired as he represented at the hearing and noted that Plaintiff participated in activities that demonstrated a greater ability to concentrate. The ALJ also noted that Plaintiff's symptoms were responsive to medical intervention and treatment and have improved over time. He found, though, that there was likely some degree of diminished concentration, persistence, and pace as an effect of Plaintiff's other psychiatric symptoms. The ALJ acknowledged that aggravating factors

included feeling stress from being overwhelmed and accordingly limited Plaintiff to simple, routine, and repetitive tasks in an effort to avoid causing him to feel overwhelmed.  (Tr. 31-32.) The ALJ further found the limitation to simple, routine, and repetitive tasks and reduced contact with others was supported by the opinions of Drs. Eisenberg and Kasper that Plaintiff could perform and persist at simple, repetitive tasks on a routine basis and work in a noncomplex work environment.  (Tr. 32.)

The ALJ's explanation of how the restriction to "simple, routine, and repetitive tasks with occasional interaction with coworkers and occasional interaction with the general public . . . [and] supervision on a basic level" in Plaintiff's mental RFC accommodated moderate limitations in concentrating, persisting, or maintaining pace was adequate.  It was not the "one size fits all," cookie-cutter approach disapproved by the Court of Appeals.  *See Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014).  Instead, the ALJ took a reasoned, tailored approach to reducing the likelihood that Plaintiff would feel overwhelmed by work and would suffer aggravated mental impairment symptoms as a consequence.  Further, it was supported by the psychological opinions of the state agency consultants.  The Court of Appeals found a similar component of an RFC appropriate to reflect moderate limitations—that is, an assessment of fair abilities—in concentration, persistence, and pace and in social interactions and supervision where the limitations were consistent with agency consultants' opinions.  *See Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021).  Thus, ALJ Shilling's restriction in Plaintiff's RFC to simple, routine, and repetitive tasks adequately reflected Plaintiff's moderate limitations in concentration, persistence, and pace, was supported by substantial evidence, and was a logical step to reduce Plaintiff's known stressors.  The ALJ's hypotheticals to the VE limiting Plaintiff to simple, routine, and repetitive tasks therefore adequately reflected Plaintiff's limitations.

The Plaintiff also faults the ALJ for not incorporating off-task time or absenteeism into the hypotheticals posed to the VE.  The ALJ did, in fact, include those concepts by asking the VE whether competitive employment would be available if Plaintiff were "unable to maintain an acceptable level of punctuality and attendance," "unable to stay on task or complete their tasks for up to two and a half hours in an eight-hour workday," or "required additional breaks totaling up to at least 20 minutes."  The VE responded that competitive employment would not be available with those limitations.  (Tr. 98-99.)  However, as discussed above, the ALJ declined to find Plaintiff subject to off-task or attendance limitations based on the medical evidence in the record and the ALJ's assessment of Plaintiff's subjective complaints regarding the effects of his impairments.  The Court will not reweigh the evidence or substitute its judgment for the ALJ's with regard to this aspect of the RFC.

**3.    Conflict Between VE's Testimony and Occupational Outlook Handbook**

Plaintiff faults the ALJ for failing to identify, obtain a reasonable explanation for, and resolve a conflict between the VE's testimony and the Bureau of Labor Statistics Occupational Outlook Handbook (OOH).  *See* SSR 00-4P, 2000 WL 1898704, at *1 (Dec. 4, 2000); Bureau of Labor Statistics, U.S. Dept. of Labor, *Occupational Outlook Handbook,* 2010-2011 Edition (2010).  SSR 00-4P says,

> When there is an apparent unresolved conflict between VE . . . evidence and the [Department of Labor's Dictionary of Occupational Titles (DOT)], the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. . . .  The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000).  The ALJ must ask at the hearing whether there is an inconsistency between the VE's testimony and the DOT.  *Id.*

Plaintiff asserts that the three jobs identified as existing in significant numbers in the national economy that Plaintiff could perform—merchandise marker (150,000 jobs), routing clerk (74,000 jobs), and folding machine operator (76,000 jobs) (Tr. 97.)—generally require working around heavy moving machinery as reflected in the OOH. Such jobs, Plaintiff contends, are not permitted by Plaintiff's RFC, which requires avoiding hazardous moving machinery. Plaintiff also asserts that they are categorized as SVP 2[4], which requires up to a month of training and therefore is not compatible with Plaintiff's RFC limitation on social interaction. Social Security Administration Program Operations Manual System DI 25001.001A.77, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#a77 (visited Mar. 23, 2022).

Plaintiff has pointed to nothing in the VE's testimony about these jobs that appears to be in conflict with the DOT.[5] Instead, Plaintiff points to an alleged conflict with the OOH, but there is no requirement for consistency with the OOH. Indeed, the ALJ asked the VE to notify him of any inconsistencies between her testimony and the DOT, and she did not identify any conflict. She also identified these jobs as available despite Plaintiff's social limitation to only occasional interaction with coworkers or supervision at a basic level. Now Plaintiff asks the Court to reweigh the VE's testimony and come to a different conclusion about the named jobs and whether the training required to do those jobs fit within his RFC, but that is not this Court's task. *See Zoch v.*

---

[4] SVP stands for "specific vocational preparation" and indicates on a scale of one to nine the amount of time required for a typical claimant to "[l]earn the techniques, [a]cquire the information, and [d]evelop the facility needed for average performance in a job." *See* Social Security Administration Program Operations Manual System DI 25001.001A.77, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#a77 (visited Mar. 23, 2022).

[5] The Court acknowledges that the DOT, last revised in 1991, contains abysmally outdated information about jobs and job availability. *See* DOL, Status of the Dictionary of Occupational Titles; use in Social Security disability adjudications, available at https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT (visited Mar. 25, 2022). Nevertheless, SSA regulations still require its use at Steps 4 and 5. The SSA anticipates eventually replacing the DOT with the forthcoming Occupational Information System (OIS) as its primary source for occupational information in the disability adjudication process, *see* SSA, Occupational Information System Project, available at https://www.ssa.gov/disabilityresearch/occupational_info_systems.html (visited Mar. 25, 2022), but this changeover has not yet occurred.

*Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

In sum, the VE's testimony was not so flawed or apparently in conflict with the DOT that the ALJ should have made further inquiries or rejected it as substantial evidence in support of his decision. Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). There is nothing about the VE's testimony that a reasonable mind could not accept in support of ALJ Shilling's findings at Step 5.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Shilling committed no errors of law and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's applications for DIB, a period of disability, and SSI is **AFFIRMED**.

The Clerk of Court is **DIRECTED** to enter judgment in favor of the Commissioner.

**IT IS SO ORDERED.**
**DATED: April 6, 2022**

                                                                              s/ J. Phil Gilbert
                                                                              **J. PHIL GILBERT**
                                                                              **DISTRICT JUDGE**